**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARLA VASQUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv- |
| | ) | |
| v. | ) | Hon. |
| | ) | |
| THE BOARD OF EDUCATION for | ) | <u>JURY DEMANDED</u> |
| SCHOOL DISTRICT U-46, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

Plaintiff, Carla Vasquez ("Plaintiff" or "Ms. Vasquez"), by her undersigned

attorneys, for her Complaint against Defendant, the Board of Education for School

District U-46 ("Defendant," or "District"), alleges as follows:

## <u>PARTIES</u>

1.      Plaintiff is a resident of Kane County in the State of Illinois.

2.      Defendant is a school district in the State of Illinois, organized and

operating in the counties of Cook, DuPage and Kane.  The Board is charged with and

responsible for the operation of the public schools within District U-46.

3.      At all times relevant to this Complaint, Defendant has employed at least

15 employees, has been an "employer" as defined by the Americans with Disabilities

Act ("ADA") and has otherwise been acting as an "employer" as legally-defined for purposes of each cause of action asserted herein.

## JURISDICTION AND VENUE

4.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over all federal employment law claims asserted in this Amended Complaint pursuant to the ADA.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to hear the additional Illinois state claims, which are based on the same facts and circumstances as the original federal claims and are so closely related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b) because it is the venue in which the events or omissions giving rise to Plaintiff's claims occurred.

## FACTS COMMON TO ALL CAUSES OF ACTION

### Ms. Vasquez Renders 11 Years of Uninterrupted Service as a Bus Driver's Aide and Vehicle Maintenance Worker

6.      In August of 1997, Plaintiff commenced full-time employment with the District as a bus driver's assistant.  Her job consisted primarily of assisting children with disabilities to board, ride and exit school transportation vehicles.

7.      In connection with her employment by the District, Plaintiff joined the District U-46 Transportation Union ("DUTU").

8.  At the time of hiring Plaintiff, the District paid her a salary of $8.25/hr. Plaintiff also had health and other benefits which included the District's payment of medical insurance premiums.

9.  Throughout her employment by the District, Plaintiff had a consistently positive record of attendance, timeliness and service to the District.

10.  Plaintiff received pay increases commensurate with her record of continuous service to the District.

11.  Plaintiff never received a single negative review or evaluation from the District regarding her work performance.

12.  Plaintiff also worked shifts performing bus fleet maintenance for the District.

13.  At the time of her wrongful termination, Plaintiff was generally working a total of 40 hours per week: 30 hours per week earning $15.75 per hour as a driver's assistant, and working another 10 hours per week earning $16.07 per hour performing bus fleet maintenance services.

## Ms. Vasquez Suffers Successive On-the-Job Injuries
### Entitling Her To Workers' Compensation Payments

14.  On or about December 3, 2008, Plaintiff was in the process of securing the wheels of a wheelchair of a disabled child to the floor of the bus when she sustained injuries to her neck, left shoulder and arm.

15.     Following all District and DUTU protocols, Plaintiff obtained a diagnosis and treatment plan for her service-connected injuries, which included physical therapy and medication for injury to her cervical spine and tendonitis.

16.     Pursuant to her doctor's orders, Plaintiff did not work for approximately seven months.  During this time she received workers' compensation in the amount of $718.04 every two weeks.

17.     On or about July of 2009, Plaintiff was authorized by her treating physician, Dr. Rodney Rieger, to return to full-duty employment, which she did immediately, serving as a driver's assistant on a summer bus route.

18.     Upon her return to work in July of 2009, Plaintiff exercised her seniority to select a bus route that did not include any wheelchair-bound students.

19.     On or about December 15, 2009, Plaintiff was again injured during the course of her employment.  While Plaintiff was attempting to assist a disabled child into her seat, the child became physically combative, causing Plaintiff to receive an injury to her neck and left shoulder.

20.     Again following District and DUTU protocols, Plaintiff obtained a diagnosis and treatment for these service-connected injuries through Dr. Rieger.

21.     Plaintiff continued to work while receiving physical therapy and medication under Dr. Rieger's care.

22.     Although continuing to experience pain, Plaintiff was able to work, obtaining pain relief from occasional cortisone shots.

23.     Plaintiff continued working while obtaining injections every three to four months and while continuing physical therapy under Dr. Rieger's care.

24.     These treatments continued until, in or about December of 2011, an adjustor for the District's workers' compensation claims agent, Sedgwick Claims Management Services, Inc. ("Sedgwick"), denied the continuation of the cortisone treatment.

**The District Learns That Plaintiff Needs Surgery, Refuses to Consider Possible Reasonable Accommodations and Surreptitiously Initiates A Leave Of Absence**

25.     On or about January 7, 2012, on the order of Dr. Rieger, Plaintiff had a magnetic resonance imaging study ("MRI") performed on her left arm and shoulder. The MRI revealed the Plaintiff had tears in her rotator cuff that required a surgical procedure to correct.

26.     By referral from Dr. Rieger, Plaintiff consulted with a surgeon, Dr. Atluri, on or about January 30, 2012.  Dr. Atluri informed Plaintiff that she needed rotator-cuff surgery and authorized her to return to work with certain restrictions prior to her surgery.

27.     On or about February 13, 2012, Plaintiff was granted a meeting with the District's Assistant to Director of Transportation, Carin Bjourn to discuss her work restrictions and upcoming surgery.

28.     During this meeting, Ms. Bjourn informed Plaintiff that she would be required to stop working and immediately placed on a "workers' compensation leave." Ms. Bjourn informed Plaintiff that the District's policy was not to permit employees to work with restrictions.  Ms. Bjourn informed Plaintiff that no accommodation of any kind would be considered for Plaintiff to permit her to continue to work.

29.     Ms. Bjourn informed Plaintiff that the District would contact the adjustor to initiate workers' compensation checks payable to Plaintiff and explained that workers' compensation would commence after three days of missed work.

30.     Plaintiff began receiving workers' compensation checks in the amount of $965.06 every two weeks.

31.     It would be more than a year later, during a grievance hearing, that Plaintiff would learn that the District filled out leave-of-absence notification documents on Plaintiff's behalf, without her knowledge or participation, and placed those documents in her personnel file.

32.     The effect of the District's actions would be to start a one-year period after which, pursuant to the District's interpretation of its policy, Plaintiff could be terminated if she did not return to work.

**Plaintiff Has Surgery, Keeps the District Informed Of Her
Medical Status and Is Repeatedly Told That the District
<u>Does Not Make Any Accommodations For Injured Employees</u>**

33.     On March 14, 2012, Plaintiff underwent surgery, approved by Sedgwick, to repair her torn rotator cuff.

34.     On or about April 10, 2012, Plaintiff notified Ms. Bjourn that she was released to work with certain restrictions which, as before her surgery, did not prevent her from performing her job.  On April 17, 2012, Plaintiff delivered a physician's note stating that she could return to work with restricted use of her affected arm.

35.     Ms. Bjourn, on behalf of the District, again informed Plaintiff that she could not return to work as long as she had any work restrictions.

36.     Between April and November of 2012, Plaintiff continued rehabilitative treatment and, each month provided the District with physician's notes stating that Plaintiff was able to return to work with restricted use of her affected arm.

37.     Each time Plaintiff provided the physician's note, she requested to return to work at her position or a position that would accommodate her restriction.  Each time, Ms. Bjourn informed her that the District does not permit a return to work if there are any medical restrictions and does not provide employees with assignments to accommodate medical restrictions.

38.     As the District was aware, from the time of her second injury and up until she was told to stop working on February 13, 2012, Plaintiff had continued to work at

7

her position with these medical restrictions, by exercising her seniority to work on "harness-runs" and other tasks that did not involve heavy lifting.

**Plaintiff's Treating Physician Recommends An Additional Surgery;**
**<u>Sedgwick Refuses and Requires an IME Which Is Rescheduled 5 Times</u>**

39.     On November 29, 2012, Dr. Atluri recommended elbow surgery to resolve the continuing issues with Plaintiff's affected arm.  He also, fully aware of the nature of her job duties, again released her to work with restricted use of the affected arm.

40.     On November 30, 2012, Plaintiff delivered Dr. Atluri's note of restrictions to Ms. Bjourn and informed her that, according to Dr. Atluri, she would need elbow surgery.  Mr. Bjourn informed Plaintiff again that no accommodation would be made due to "District policy."

41.     Sedgwick refused to authorize the second surgery and directed Plaintiff to obtain an independent medical examination ("IME") from a physician of the District's choosing.

42.     Plaintiff's IME appointment was canceled and re-scheduled 5 times by the examining physician's offices between November and January 17, 2013, when the examination was finally conducted by Dr. Anderson on January 17, 2013.   Dr. Anderson's report is filled with disclaimers due to his not being a shoulder surgeon and makes no reference to Dr. Atluri's recommendation for elbow surgery.  On January 28, 2013, Sedgwick stopped authorizing treatment for Plaintiff's injured shoulder.

43.     On February 12, 2013, Dr. Atluri again examined Plaintiff and advised her that she could return to work with the same restriction on the use of the affected arm.

44.     On the next day, February 13, 2013, Plaintiff delivered Dr. Atluri's note concerning her medical status to the District's Human Resources department.

**Plaintiff Is Terminated Based On the Expiration of her "Leave of Absence"**
**and Her Alleged Failure to Keep the District Apprised of Her Medical Status**

45.     Plaintiff received a letter in her mailbox on February 13, 2013, which letter was also *dated* February 13, 2013, from Beth Berg, Coordinator Employee Benefits School Dist. U-46 (the "Termination Notice") informing Plaintiff that her 12-month leave-of-absence was exhausted on February 12, 2013, and that "since no information has been received regarding your release to return to work," termination would be recommended to the Board of Education.

46.     The Termination Notice further informed Plaintiff that "Re-employment can only be considered upon receipt of my physician's release to full duty, in addition to an updated employment application."   A copy of the termination notice is attached hereto as Exhibit A.

**The District Discontinues Plaintiff's Workers Compensation**
**Benefits and Denies Coverage for a Necessary Second Surgery**

47.     Plaintiff stopped receiving workers' compensation checks after January 24, 2013.  Then, after concluding that the IME mistakenly evaluated Plaintiff's neck and shoulder, rather than her elbow, the District, through Sedgwick, provided Plaintiff with

back payments in a lump sum of $ 5,307.83 to cover the period January 25, 2013 until April 19, 2013.

48.     The District arranged for another IME evaluation by Dr. Benson which, pursuant to his report dated May 29, 2013, supported their refusal, contrary to Dr. Atluri's findings, to provide surgery for Plaintiff's elbow.

49.     Plaintiff's temporary total disability ("TTD") payments were stopped as of June 6, 2013.

50.     Plaintiff was denied Social Security Disability benefits because the Office of Social Security determined that, on the basis of her medical records, Plaintiff was able to work with certain restrictions.

51.     Having recommended elbow surgery back in November of 2012, which the District repeatedly refused to authorize, in or about April of 2014, Dr. Atluri determined that, despite the District's refusal, he would perform the second surgery. Dr. Atluri informed Plaintiff that by not having the elbow surgery, she was causing increased and potentially irreversible damage to the elbow. Sedgwick refused to approve this surgery for coverage. Due to the potentially permanent disabling effects, Dr. Atluri performed the surgery, without compensation, on or about May 9, 2014.

52.     It was not until June of 2014, after Plaintiff was advised that she could use health insurance through the state while her workers' compensation claim was being

disputed by the District, that Plaintiff was able to resume treatment for her shoulder (which Sedgwick stopped authorizing in January of 2013).

**Plaintiff Initiates DUTU Grievance Seeking to Return to Work With or Without Reasonable Accommodation; District Offers Plaintiff Her Job Back On Condition That She Release Them From All Discrimination and Other Claims**

53.  Following her termination, Plaintiff sought to be reinstated to work with or without reasonable accommodation for her medical restrictions. Her DUTU representatives refused to file a grievance pursuant to the DUTU collective bargaining agreement ("CBA") on Plaintiff's behalf, so Plaintiff initiated the grievance process on her own. At each turn, her grievance was denied by the District.

54.  Pursuant to the CBA, the Step IV grievance is arbitration. After initially voting to request arbitration, DUTU presented Plaintiff, on or about October 3, 2013, with a settlement offer from the District in lieu of arbitration.

55.  Among other issues, the proposed settlement only permitted Plaintiff to return to work upon her release to full duty, and still gave the District the right to categorically refuse to provide any reasonable accommodations to Plaintiff to return to work.

56.  While the negotiations were ongoing, on or about December 30, 2013, Plaintiff filed a charge of discrimination under the ADA with the U.S Equal Employment Opportunity Commission ("EEOC") in its Chicago, Illinois office. A copy of the Notice of Charge is attached hereto as Exhibit B.

11

57.     Due to, among other things, the District's refusal to allow for reasonable accommodations and its requirement that Plaintiff dismiss and release the District from all claims, including the EEOC charges and all claims under the ADA, Plaintiff rejected the District's proposed settlement.

58.     On or about April 8, 2014, Plaintiff's DUTU representative informed her that the District was prepared to offer Plaintiff her job back on the condition that she drop her discrimination charges filed with the EEOC.

59.     The Department of Justice issued Plaintiff a notification of her right to commence a civil action by letter dated April 22, 2016.  A copy of the right to sue letter is attached hereto as Exhibit C.

## COUNT I
**(Discrimination in Violation of the ADA, 42 U.S.C § 12101 *et seq.*
and the Illinois Human Rights Act ("IHRA") 775 ILCS 5/1-101 *et seq.*)**

60.     Plaintiff re-alleges paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61.     Plaintiff was, at all relevant times herein, including those times she was refused accommodation and was terminated, disabled, had a record of a disability or was regarded as having a disability.  At all such times, Plaintiff had a physical impairment that substantially limited one or more major life activities, including, without limitation, bathing, dressing, caring for her children and house-cleaning, had a record of such impairment or was regarded by the District as having such impairment.

62.     At all relevant times herein, including those times she was refused accommodations and was terminated, Plaintiff was a qualified individual with a disability in accordance with the ADA and the IHRA.  Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation, as a bus driver's assistant and/or performing fleet maintenance.

63.     Defendant's refusal to reasonably accommodate Plaintiff and termination of Plaintiff constitute unlawful discrimination against Plaintiff in violation of, *inter alia*, the ADA and IHRA.

64.     As a result of Defendant's unlawful discrimination based on Plaintiff's disability, record of disability or being regarded as disabled, Plaintiff has suffered lost wages, severe emotional distress, humiliation, anguish and suffering and has been damaged thereby in an amount to be determined at trial.

## COUNT II
### (Retaliation in Violation of the ADA, 42 U.S.C. § 12203 and the IHRC 735 ILCS 5/6-101)

65.     Plaintiff re-alleges paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     By filing a charge of discrimination under the ADA through the EEOC, Plaintiff engaged in a statutorily protected activity.

67.     Following her engagement in such protected activity, Plaintiff suffered adverse employment actions by the District, including, but not limited to, the District's refusal to rehire her.

68.     There was a causal link between Plaintiff's protected activity pursuant to the ADA and the District's adverse employment action insofar as, without limitation, the District informed Plaintiff that she would not be rehired unless she discontinued and released the District from all of her claims against them, specifically including her discrimination claims under the ADA.

69.     As a result of Defendant's unlawful retaliation for engaging in protected activity pursuant to the ADA, Plaintiff has suffered lost wages, severe emotional distress, humiliation, anguish and suffering and has been damaged thereby in an amount to be determined at trial.

## COUNT III
### (Retaliatory Discharge In Violation of
### 820 ILCS 305/4 and Illinois Common Law)

70.     Plaintiff re-alleges paragraphs 1 through 59 of this Complaint as though fully set forth herein.

71.     Plaintiff was, at all relevant times, including at such times as she sustained the service-connected injuries described hereinabove, an employee of the District.

72. During the course of her employment and before she was terminated, Plaintiff exercised her rights granted by the Illinois Workers Compensation Act ("IWCA"), including the right to seek compensation for her service-connected injuries.

73. A causal relationship between the District's termination of Plaintiff and her exercise of rights under the IWCA exists as evidenced by, *inter alia*, the District's institution of a surreptitious plan to terminate her following her exercise of rights under the IWCA, the conduct of the District's agents in refusing to approve necessary medical care, the District's similarly retaliatory discharges of several other employee's under similar circumstances and the temporal proximity of Plaintiff's exercise of her rights under the IWCA and the District's undertaking to terminate her.

74. The District's motivation in terminating Plaintiff was to deter her exercise of the protected activity of seeking benefits under the IWCA.

75. As a result of Defendant's unlawful retaliatory discharge, Plaintiff has suffered lost wages, severe emotional distress, humiliation, anguish and suffering and has been damaged thereby in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant on all counts as follows:

(a) awarding Plaintiff damages on her claims, including back pay, front pay, lost benefits, compensatory damages and punitive damages in an amount to be determined at trial; and

(b)     awarding Plaintiff her costs, attorneys' fees, pre-judgment interest and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

CARLA VASQUEZ

By:     /s/   Steven M. Shebar
          One of Her Attorneys

SHEBAR LAW FIRM
110 N. Gables Blvd.
Wheaton, Illinois 60187
708.434.5669
630-877-6833 (mobile)
steveshebar@shebarlaw.com